## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| ERICA S. MAPPS, on behalf of M.J., | § | |
| Plaintiff, | § | |
| v. | § | No. 3:09-CV-2226-O-BH |
| | § | |
| MICHAEL ASTRUE, Commissioner of | § | |
| Social Security, | § | |
| Defendant. | § | |

### FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to *Special Order No. 3-251*, this case was automatically referred for proposed findings of fact and recommendation for disposition. Before the Court are *Plaintiff's Motion for Summary Judgment* (doc. 16), filed March 1, 2010, and *Commissioner's Motion for Summary Judgment* (doc. 17), filed April 1, 2010. Based on the relevant filings, evidence, and applicable law, the Court recommends that *Plaintiff's Motion for Summary Judgment* be **GRANTED** in part, the *Commissioner's Motion for Summary Judgment* be **DENIED**, and the case be remanded to the Commissioner for further proceedings.

### I. BACKGROUND[1]

#### A. <u>Procedural History</u>

Erica S. Mapps ("mother"), on behalf of her minor daughter M.J. ("Plaintiff"), seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claim for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1382. On March 1, 2005, the mother filed for SSI benefits on behalf of Plaintiff claiming disability commencing on October 26, 1997.[2] (Tr. at 82-85.) Plaintiff's application was denied

---

[1] The background information comes from the transcript of the administrative proceedings, which is designated as "Tr."

[2] A prior application that was filed on behalf of the child in November 2003, (Tr. at 78-81), is not at issue in this case.

initially and upon reconsideration.  (Tr. at 46-51, 53-56.)  The mother timely requested a hearing

before an Administrative Law Judge ("ALJ").  (Tr. at 59.)  Plaintiff and her mother personally

appeared and testified at a hearing held on August 2, 2006.  (Tr. at 481, 485-509.)  The ALJ issued

an unfavorable decision on August 22, 2006.  (Tr. at 269-78.)  The Appeals Council granted a

request for review and remanded the matter to the ALJ for further proceedings.  (Tr. at 282-88.)

Plaintiff and her mother personally appeared and testified at a supplemental hearing held on

November 9, 2007.  (Tr. at 510, 520-37.)  The ALJ heard testimony from a medical expert on Febru-

ary 2, 2009.  (Tr. at 540-52.)  The ALJ issued a second unfavorable decision on April 28, 2009.  (Tr.

at 11-25.)  The Appeals Council denied a request for review, and the ALJ's decision became the

final decision of the Commissioner.  (Tr. at 6-8.)  Through her mother, Plaintiff appealed the Com-

missioner's decision to this Court pursuant to 42 U.S.C. § 405(g) on November 20, 2009.

## B.  Factual History

### 1.  Age and Education

Plaintiff was born in October 1997.  (Tr. at 82.)  She was eight years old, entering the second

grade, at the August 2, 2006 hearing.  (Tr. at 485-86.)  She was ten years old and in third grade at

the November 9, 2007 hearing.  (Tr. at 520.)

### 2.  Medical Evidence

On January 16, 2004, Carla Herren, Ph. D., evaluated Plaintiff's intelligence quotient ("IQ")

and mental status at the request of a state disability agency.  (*See* Tr. at 179-81.)  According to her

mother, Plaintiff had been born prematurely and stayed in the hospital for seven months.  (Tr. at

179.)  Dr. Herren administered the Wechsler Intelligence Scale for Children ("WISC-III"), which

had a normative mean score of 100 with a standard deviation of 15.  (Tr. at 180.)  Plaintiff had a Full

2

Scale IQ of 71 and scored 74 for Verbal IQ, 73 for Performance IQ, 77 for Verbal Comprehension, 71 for Perceptual Organization, and 64 for Freedom from Distractibility.  (*Id.*)  The test also had a normative mean score of 10 for scale scores of the subtests with a standard deviation of 3.  (*Id.*) Plaintiff had five scale scores that were two standard deviations or lower from the norm – scoring 4 on Digit Span, Picture Arrangement, and Object Assembly; 3 on Arithmetic; and 2 on Similarities. (*Id.*)  A Wide Range Achievement Test ("WRAT-3") showed that Plaintiff was at a kindergarten level for reading, spelling, and math.  (*Id.*)  Plaintiff's prognosis was guarded and she was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and Borderline Intellectual Functioning ("BIF").  (Tr. at 181.)

Beginning February 3, 2004, Lakes Regional MHMR ("Lakes Regional") diagnosed Plaintiff with Oppositional Defiant Disorder ("ODD").  (Tr. at 309.)  Within a couple days, State physicians reviewed the evidence, noted impairments of ADHD and "premature/asthma", and found a severe impairment or combination of impairments that did not functionally equal a listed impairment.  (Tr. at 186.)  The physicians evaluated six domains of functioning and concluded that Plaintiff had no limitation in two domains and less than marked limitation in the others.  (Tr. at 188, 190.)

A February 20, 2004 Psychiatric Evaluation at Lakes Regional indicated that teachers had noted "nearly daily (or hourly) problems" with disruptive and inattentive behavior.  (Tr. at 221, 388.)  ADHD symptoms were noted, and a medication plan developed.  (Tr. at 224, 391.)  In early April 2004, Plaintiff's mental status was "normal."  (Tr. at 219, 411.)  In July 2004, the ADHD diagnosis was again noted, and medication was prescribed.  (Tr. at 217-18, 408-10.)  In October 2004, the diagnosis was described as ODD and Plaintiff had a Global Assessment of Functioning ("GAF") score of 50.  (Tr. at 216.)  Between December 2004 and April 2005, the diagnosis was

again ADHD, and it was noted in December that Plaintiff was unfocused, even with medication, but clearly worse without it.  (Tr. at 207-10, 213-14, 402-07.)  In April, the ADHD was fully responsive to medication, and Plaintiff had a symptom severity level of zero.  (*Id.* at 207, 402.)

Linda Ludden, Ed. D., interviewed Plaintiff and her mother in May 2005.  (*See* Tr. at 192-94.)  At that time, Plaintiff's prognosis was good with counseling and medication management.  (*Id.*)  Dr. Ludden diagnosed Plaintiff with ODD and noted a potential diagnosis of BIF contingent upon corroborating evidence.  (Tr. at 194.)

The next month, State physicians again reviewed the evidence, noted impairments of ODD and BIF, and found a severe impairment or combination of impairments that did not functionally equal a listed impairment.  (Tr. at 196.)  Plaintiff had less than marked limitation in acquiring and using information and no limitation in the other evaluated domains.  (Tr. at 198, 201.)

Medical records of Lakes Regional dated July 20, 2005, show an ODD diagnosis and a GAF score of 50.  (Tr. at 203.)  Records of August 2005 noted an ADHD diagnosis with partial response to medication.  (Tr. at 205-06, 399-400.)

In September 2005, State physicians reviewed the evidence, noted impairments of ADHD, BIF, and history of ODD, and found a severe impairment or combination of impairments that did not functionally equal a listed impairment.  (Tr. at 232.)  The physicians evaluated six domains of functioning and concluded that Plaintiff had no limitation in three domains and less than marked limitation in the other domains.  (Tr. at 234-35.)

Records from November 2005 show that Plaintiff's ADHD was partially responsive to medication.  (Tr. at 396-97.)  As of February 2006, her ADHD was fully responsive to medication.  (Tr. at 393-94.)

4

At a consultative psychological examination in July 2006, Kristi Compton, Ph. D., diagnosed ADHD, ODD, and BIF.  (Tr. at 267.)  At that time, Plaintiff had poor peer relationships, poor academic performance, and a GAF score of 45.  (*Id.*)  Plaintiff exhibited oppositional behaviors and attentive and learning problems, even with medication.  (Tr. at 264.)  Dr. Compton administered WISC-IV to assess Plaintiff's intellectual abilities, and found that her Full Scale IQ of 71 "falls within the borderline range of intellectual functioning."  (Tr. at 265-66.)  Plaintiff scored below five on three subtests – 4 on Digit Span and 3 on Picture Concepts and Matrix Reasoning.[3]  (*Id.*) According to WRAT-3, Plaintiff was functioning in the lower range of first grade abilities for reading, spelling, and math despite completing the first grade twice and being eight years and nine months old.  (Tr. at 266.)  Dr. Compton found Plaintiff "significantly delayed" in these areas, and that "her combination of behavioral and intellectual deficits has resulted in marked impairments in social, academic, and personal functioning."  (*Id.* at 266-67.)  Plaintiff's prognosis was guarded. (Tr. at 267.)

In August 2006, Lakes Regional continued to diagnose Plaintiff with ODD.  (Tr. at 309.) She had a GAF score of 50 and minimal response to medication.  (Tr. at 309, 384.)  Two months later, Lakes Regional also diagnosed ADHD and continued to prescribe medication.  (Tr. at 311-15.) Records of Lakes Regional show the same dual diagnosis through June 2008.  (*See* Tr. at 320-59, 414-50.)

On September 12, 2008, Deborah Whitehead Gleaves, Ph. D., diagnosed Plaintiff with ADHD, ODD, a learning disorder, and mild mental retardation.  (Tr. at 456.)  Dr. Gleaves administered the WISC-IV and WRAT-3 tests.  (Tr. at 454.)  Although Plaintiff "put forth good effort",

---

[3] Although the report does not indicate the mean score (Tr. at 262-68), the mean for subtests of WISC-III was ten with a standard deviation of three (*see* Tr. 180).

she had a Full Scale IQ of 60 and performed below grade level in reading, spelling, and math.  (Tr. at 454-55.)  She scored below five on six subtests – 4 on Vocabulary, Picture Concepts, Letter Number Sequencing, and Symbol Search, and 3 on Comprehension and Digit Span.[4]  (Tr. at 455.) Her GAF score was 50.  (Tr. at 457.)

Between November 2008 and January 2009, Lakes Regional prescribed medication for ADHD and ODD.  (Tr. at 462-80.)

### 3. School Records

School records from December 2003 indicate that during kindergarten, Plaintiff had difficulty focusing on lessons and would "frequently roll on the floor or look away."  (Tr. at 96). She would also frequently argue with classmates.  (*Id.*)  Her teacher rated her as below average in following oral instructions, expressing self adequately when called upon, and retaining instructions week to week.  (Tr. at 97.)  Later records indicate that her behavior needed improvement when she was passed to first grade in 2004.  (Tr. at 132.)

In January 2004, Plaintiff was sent home for disrupting class, disrespecting authority, and excessive talking.  (Tr. at 139.)  She was placed in "timeout" for the afternoon in February 2004 for similar conduct.  (Tr. at 140.)  In October 2004, she was identified as an "at risk" student.  (Tr. at 133.)

In March 2005, Plaintiff's teacher, Ms. Hogue, completed a function report indicating that Plaintiff had limited abilities to progress in learning and to pay attention and persist with a task.  (Tr. at 112-20.)  Plaintiff was making slow progress in reading and was about four months behind her peers.  (Tr. at 116.)  She had difficulty with math and could not write more than a few sentences on

---

[4]  The report does not indicate the mean score or standard deviation for the subtests.  (*See* Tr. at 451-58.)

her own.  (*Id.*)  Although she had a limited ability to pay attention, she did "very well" when taking her medication.  (Tr. at 120.)  On March 28, 2005, Ms. Hogue again noted that Plaintiff was below level in reading and math.  (Tr. at 122.)  Ms. Hogue rated her as below average in understanding classroom discussions, expressing self adequately when called upon, independently initiating activities, and retaining instructions week to week.  (Tr. at 123.)  She noted that Plaintiff would likely be held back in first grade.  (*Id.*)  Plaintiff's behavior was "excellent" when taking her medication.  (Tr. at 122.)  Plaintiff's first grade report card for 2004-05 showed problems with math, reading, and language arts.  (Tr. at 131.)  In May 2005, Plaintiff was retained in first grade.  (Tr. at 135.)

The next August, Plaintiff's teacher, Ms. Bookout, noted that Plaintiff had trouble focusing until her medicine took effect.  (Tr. at 152.)  At that time, Plaintiff was working at grade level because it was her second year in first grade.  (*Id.*)  Ms. Bookout rated her as average in all areas of behavior when medicated.  (Tr. at 153.)  She indicated in December 2005 and February 2006 that Plaintiff had significant problems with attention and conduct when not medicated.  (*See* Tr. at 146, 161.)

In January 2008, Plaintiff's third grade teacher, Ms. Purser, indicated that Plaintiff had significant problems with attention and conduct.  (Tr. at 292.)  Plaintiff was rated as "very below" other students with respect to attention span, concentration, on-task behavior, and ability to work independently.  (Tr. at 293.)  She noted the following behavior concerns:  anger, aggressive, pushing, picking on, not responsive, and not following instructions and rules.  (*Id.*)

### 4.  Hearing Testimony

Plaintiff and her mother testified at hearings before the ALJ on August 2, 2006, and November 9, 2007.  (Tr. at 485-509, 520-37.)  A medical expert ("ME") testified at a February 2, 2009

hearing.  (Tr. at 540-52.)  Plaintiff was represented by an attorney at each hearing.  (*See* Tr. at 481, 510, 540.)

### a.  *Plaintiff's Testimony*

Upon examination by the ALJ at the first hearing, Plaintiff testified that she was eight years old and about to start the second grade.  (Tr. at 485-86.)  She liked the first grade and her teacher, but she would yell at classmates because they picked on her.  (Tr. at 486-88.)  She ignored her brothers and fought with her sister over the remote control.  (Tr. at 490.)  She would watch television and visit friends to play video games.  (Tr. at 491-93.)  She regularly attended school and took her medicine all the time.  (Tr. at 494.)  She could dress and feed herself, brush her teeth, and knew to look for cars before crossing the street.  (Tr. at 494-95.)

At the second hearing, Plaintiff was ten years old and in the third grade.  (Tr. at 520.)  She liked math and reading tutoring.  (Tr. at 520-21.)  She had been in trouble at school for talking, yelling, and disrupting the classroom.  (Tr. at 521.)  She liked to play tag or jump rope outside.  (Tr. at 524.)  She would sometimes fight with her siblings.  (Tr. at 526.)  She could care for herself.  (Tr. at 528-29.)

### b.  *Mother's Testimony*

Plaintiff's mother testified at the first hearing that Plaintiff would fight with her siblings, except her oldest brother.  (Tr. at 496-98.)  Plaintiff had similar problems with classmates when she was not on medication.  (Tr. at 498.)  At times she would act as a bully to get something she wanted.  (Tr. at 499.)  She would be disruptive in class – not doing her work, not staying in her seat, bothering other children.  (Tr. at 500-03.)  She would function really well when on her medication.  (Tr. at 504.)  She could bathe herself to some extent, feed herself, brush her teeth, and tell time on a

digital clock. (Tr. at 506-07.) Sometimes she would not mind her mother until she was threatened with a spanking. (Tr. at 507.) Her mother felt that Plaintiff did not comprehend what people were saying. (Tr. at 508.)

At the second hearing, the mother testified that Plaintiff's behavior at home and school was terrible – she argued with everyone, was the last one ready for school, took her attitude to school and caused trouble there. (Tr. at 531-32.) Although Plaintiff was in trouble at school daily, she was passing her classes. (Tr. at 532-33.) She took her medication everyday at school but it was not as effective as prior medication. (Tr. at 533-35.) She could bathe herself, brush her hair and teeth, and tell time. (Tr. at 537.)

### c. Medical Expert's Testimony

The ME testified that Plaintiff's ODD was "probably mild" and that her ADHD was "apparently well controlled with medication." (Tr. at 544-55.) By looking at those diagnoses alone, Plaintiff did "not meet a listing for childhood disorder." (*Id.*) However, his opinion regarding Plaintiff's BIF varied. (*See* Tr. at 544-48.) Based on testing done in 2004, the BIF was close but did not meet a listing. (Tr. at 546.) He was uncertain how to decipher testing done in June 2006 because it did not conform to the usual types of tests and subtests.[5] (*Id.*) Based on September 2008 testing, Plaintiff had a Full Scale IQ score of 60, and assuming the validity of that score, Plaintiff would meet Listing 112.05(D). (Tr. at 546-47.) As of that date, Plaintiff would meet the listing "for sure". (Tr. at 547.) According to the ME, she would not meet a listing based on the six domains because "she would only probably have one marked." (*Id.*) The ME also testified that testing of children remains valid only for two years, and IQ scores can be expected to go up only when the

---

[5] The ME did not note that the 2006 testing differed from the 2004 testing because the later testing used WISC-IV, an updated and revised version of WISC-III.

testing is done within a year.  (Tr. at 547-48.)

On cross-examination by Plaintiff's attorney, the ME acknowledged that IQ testing may vary up or down by five points, so a score of 71 could actually be as low as 66.  (Tr. at 548-49.)  He also indicated that Vineland testing[6] would be useful to address adaptive functioning of the claimant and aid in making the disability decision.  (Tr. at 549.)

Upon further questioning by the ALJ, the ME stated that he had not received Plaintiff's school records.  (Tr. at 549-50.)  He also expressed slight concerns about the IQ 60 score because it appeared inconsistent with other testing and had dropped.  (Tr. at 550-51.)  The ME stated that he lacked sufficient information to state a reasonable opinion regarding disability because he had nothing related to her adaptive behavior.  (*Id.*)  He testified that he was not quite certain whether she met a listing based on the information he had, and that more information might make him more comfortable in rendering an opinion.  (Tr. at 551.)

## C. ALJ's Findings

The ALJ denied Plaintiff's application for benefits by written opinion issued on April 28, 2009.[7]  (Tr. at 11-25.)  Because the ALJ determined that Plaintiff was a school-aged child at the time of the application as well as at the time of the decision, he analyzed Plaintiff's claim under the modified sequential evaluation applicable to childhood disability.  (Tr. at 17-24.)  At step one, he determined that Plaintiff had not engaged in substantial gainful activity during the relevant time period.  (Tr. at 17, ¶ 2.)  At step two, he found that Plaintiff's impairments (ADHD, ODD, and BIF) were

---

[6] This testing refers to the Vineland Adaptive Functioning Test later mentioned by the ALJ.  (*See* Tr. at 552.)

[7] The ALJ initially denied Plaintiff's application for benefits by written opinion issued on August 22, 2006.  (Tr. at 271-78.)  Although he found three medically determinable impairments (ADHD, ODD, and BIF), he found no severe impairment.  (Tr. at 274-77.)  After the Appeals Council remanded the matter to the ALJ for further proceedings (*see* Tr. at 282-88), the ALJ issued his second unfavorable decision (Tr. at 11-25).

severe. (Tr. at 17, ¶ 3.) At step three, he found that Plaintiff did not have an impairment or a com-

bination of impairments that met or medically equaled a listed impairment in the regulations. (Tr.

at 17, ¶ 4.) He also found that Plaintiff's impairments or combination of impairments did not funct-

ionally equal a listing because she had no limitations in moving about and manipulating objects, and

less than marked limitation in attending and completing tasks, interacting and relating with others,

caring for herself, and health and physical well-being. (Tr. at 17-24.) Accordingly, the ALJ con-

cluded that Plaintiff had not been disabled, as defined in the Social Security Act, since the date of

her application. (Tr. at 24, ¶ 6.)

## II.  ANALYSIS

### A.  <u>Legal Standards</u>

#### 1.  **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commis-

sioner's position is supported by substantial evidence and whether the Commissioner applied proper

legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994);

42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence is that which is relevant and sufficient for

a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but

it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting

*Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). In applying the substantial evidence stand-

ard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judg-

ment, but rather, scrutinizes the record to determine whether substantial evidence is present.

*Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a con-

spicuous absence of credible evidentiary choices or contrary medical findings to support the Com-

missioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). The relevant law and regulations governing the determination of disability are also identical. *See id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

### 2. Standard for Disability Determination

A disabled child is entitled to monthly benefits under the Social Security Act if certain conditions are met. *See* 42 U.S.C. §§ 1381a (basic entitlement to benefits), 1382 (eligibility for benefits), 1382c(a)(3) (defining disability for purposes of SSI). An individual under the age of eighteen who is not engaging in substantial gainful activity is considered disabled "if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(C).

The Commissioner utilizes a sequential three-step inquiry to determine whether a child is disabled and entitled to monthly benefits under the Social Security Act:

1.  A child who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  A child who does not have a "severe impairment" will not be found to be disabled.

3.  A child whose impairment "meets, medically equals, or functionally equals" a listed impairment in the regulations will be considered disabled if the impairment "meets the duration requirement".

20 C.F.R. § 416.924(a)-(d).

For children, the Listing of Impairments (found in appendix 1 of subpart P of part 404 of Chapter III) "describes impairments that cause marked and severe functional limitations." *Id.* § 416.925(a).  Appendix 1 is divided into Parts A and B; Part B exclusively applies to children whereas Part A applies to children only when "the disease processes have a similar effect on adults and children." *Id.* § 416.925(b).  "To meet the requirements of a listing, [the claimant] must have a medically determinable impairment(s) that satisfies all of the criteria of the listing." *Id.* § 416.925(d).  An impairment medically equals a listing "when it is at least equal in severity and duration to the criteria of any listed impairment." *Id.* § 416.926(a).  Before deciding the issue of medical equivalence, the Commissioner must receive expert opinion evidence and give the evidence appropriate weight. *See Policy Interpretation Ruling Titles II and XVI:  Consideration of Administrative Findings of Fact by State Agency Medical and Psychological Consultants and Other Program Physicians and Psychologists at the Administrative Law Judge and Appeals Council Levels of Administrative Review; Medical Equivalence*, SSR 96-6p, 1996 WL 374180, at *3 (S.S.A. July 2, 1996).

If a claimant does not have a severe impairment or combination of impairments that meets or medically equals any listing, the Commissioner determines whether the claimant has an impairment that "results in limitations that functionally equal the listings." 20 C.F.R. § 416.926a(a).  To determine whether a child's impairment functionally equals a listed disability, the impairments are evaluated for severity in six domains:  (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. *Id.* § 416.926a(b)(1).  In evaluating a child's ability to function in each domain, the Commissioner considers (1) the activities the child

is able to perform; (2) the activities the child is not able to perform; (3) which of the child's activities are limited or restricted compared to children of the same age who do not have impairments; (4) whether the child has difficulty with activities at home, in childcare, at school, or in the community; (5) whether the child has difficulty independently initiating, sustaining, or completing activities; and (6) what kind of help the child needs to do activities, how much, and how often. *Id.* § 416.926a(b)(2). If the evidence shows that a child's impairment seriously interferes with his or her "ability to independently initiate, sustain, or complete activities", the impairment is considered "marked." *Id.* § 416.926a(e)(2)(i). If the evidence shows that a child's impairment very seriously interferes with that ability, the impairment is "extreme." *Id.* § 416.926a(e)(3)(i).

### 3.  Standard for Finding of Entitlement to Benefits

Plaintiff asks the Court to reverse the Commissioner's decision and find her disabled and entitled to SSI benefits, and in the alternative, remand for further proceedings. (Pl. Br. at 22-23.)

When an ALJ's decision is not supported by substantial evidence, the case may be remanded "with the instruction to make an award if the record enables the court to determine definitively that the claimant is entitled to benefits." *Armstrong v. Astrue*, No. 1:08-CV-045-C, 2009 WL 3029772, *10 (N.D. Tex. Sept. 22, 2009) (adopting recommendation of Mag. J.). The claimant must carry "the very high burden of establishing 'disability without any doubt.'" *Id.* at *11 (citation omitted). Inconsistencies and unresolved issues in the record preclude an immediate award of benefits. *Wells v. Barnhart*, 127 F. App'x 717, 718 (5th Cir. 2005). The Commissioner, not the court, resolves evidentiary conflicts. *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

## B.  Issues

Plaintiff presents the following issues for review:

(1)      the ALJ applied an improper legal standard to evaluate Plaintiff's severe
         impairments;

(2)      the Commissioner failed to fully develop the record; and

(3)      the ALJ failed to properly determine whether Plaintiff's impairments satisfy
         a listed impairment.

(Pl. Br. at 1-2.)

## C. Issue One:  Severe Impairments

Relying on *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985) and interpretations of that case,

Plaintiff contends that the ALJ erred in not applying the correct standard for determining whether

her impairments are severe at Step 2 of the evaluative process.  (Pl. Br. at 13-15.)

In *Stone*, the Fifth Circuit found a literal application of 20 C.F.R. § 404.1520(c) inconsistent

with the Social Security Act because the definition includes fewer conditions than indicated by the

statute.  *See* 752 F.2d at 1104-05.  Accordingly, it held that an impairment is not severe "only if it

is a slight abnormality having such minimal effect on the individual that it would not be expected

to interfere with the individual's ability to work."  *Id.* at 1101.  Additionally, the determination of

severity under *Stone* may not be "made without regard to the individual's ability to perform sub-

stantial gainful activity."  *Id.* at 1104.  To ensure that the regulatory standard for severity does not

limit a claimant's rights, the Fifth Circuit held that it would assume that the "ALJ and Appeals

Council have applied an incorrect standard to the severity requirement unless the correct standard

is set forth by reference to this opinion or another of the same effect, or by an express statement that

the construction we give to 20 C.F.R. § 404.1520(c) (1984) is used."  *Id*. at 1106; *accord Loza v.*

*Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).  Notwithstanding this presumption, the Court must look

beyond the use of "magic words" and determine whether the ALJ applied the correct severity

standard. *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986).  Unless the correct standard of

severity is used, the claim must be remanded to the Commissioner for reconsideration.  *Stone*, 752

F.2d at 1106.

 *Stone* dealt with a regulation and statute that was not tailored specifically to child disability.[8]

For children, the statutory definition of disability requires a finding that the impairment "results in

marked and severe functional limitations" – a requirement omitted from the general definition of

disability.  *Compare* 42 U.S.C. § 1382c(a)(3)(C)(i) *with* § 423(d) & § 1382c(a)(3)(A).  This

standard is more stringent than the standard for adults.  *Denton ex rel Denton v. Astrue*, No. 2:04-

CV-0331, 2008 WL 763209, at *8 (N.D. Tex. Mar. 21, 2008) (adopting recommendation of Mag.

J.), *aff'd*, 295 F. App'x 702 (5th Cir. 2008).  Similarly, the regulation for determining disability for

children provides that an impairment is not severe if it "is a slight abnormality or a combination of

abnormalities that causes no more than minimal functional limitations."  20 C.F.R. § 416.924(c).

Unlike *Stone,* this regulation is consistent with the statutory definition of disability applicable in

child disability cases.  Plaintiff has not shown that *Stone* applies in this child-disability case.

**D.  Issue Two:  Fully Developed Record**

 Plaintiff next argues that the ALJ failed to fully develop the record with regard to her alleged

impairments because he did not provide all relevant information to the medical expert and failed to

order a post-hearing consultative examination to obtain Vineland testing to measure her deficits in

adaptive functioning.  (*See* Pl. Br. at 15-17.)

---

[8]  The Fifth Circuit has noted this distinction and recognized that *Stone*'s non-severity analysis applies only to adult claimants.  *See Burnside ex rel. Burnside v. Bowen*, 845 F.2d 587, 591 (5th Cir. 1988), *abrogated on other grounds by Sullivan v. Zebley*, 493 U.S. 521 (1990) (superseded by statute as stated in *Colon v. Apfel*, 133 F. Supp. 2d 330 (S.D.N.Y. 2001)).  The law in child-disability context has changed significantly since *Burnside,* however.  *See Encarnacion ex rel. George v. Barnhart*, 331 F.3d 78, 80-85 (2d Cir. 2003) (summarizing amendments).

In general, claimants bear the burden to present all evidence relevant to their claims of disability. 20 C.F.R. § 416.912(a). However, the ALJ has a duty to fully and fairly develop the facts relevant to a claim for benefits.[9] *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000). This includes a responsibility to develop a complete medical history for the relevant period. 20 C.F.R. § 416.912(d). When necessary information "is not readily available" from the claimant's records or the Commissioner is unable to obtain clarification from a medical source, the duty includes ordering a consultative examination. *Id.* § 416.912(f). *See also Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991) (recognizing that a "consultative examination may be necessary to develop a full and fair record"). However, a full inquiry requires a consultative examination only when the examination is necessary for the ALJ to make the disability decision. *Jones v. Bowen*, 829 F.2d 524, 526 (5th Cir. 1987). An examination is necessary only when the claimant has presented evidence sufficient to raise a suspicion concerning a non-exertional impairment. *Id.* If the claimant shows a failure to fulfill the duty to adequately develop the record and prejudice from the failure, the ALJ's decision is not supported by substantial evidence. *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996).

In this case, the 2008 psychological evaluation by Dr. Gleaves raised a reasonable suspicion of mental retardation. The ME testified that the 2004 testing was close to meeting a listing, and although he was uncertain about 2006 testing, the 2008 testing showed that Plaintiff met Listing 112.05(D), assuming the validity of the IQ score. (*See* Tr. at 546-47.) While he later expressed concern that the WRAT testing appeared inconsistent with an IQ of 60 and that the IQ score had dropped (*see* Tr. at 550-51), he also stated that Plaintiff would meet the listing "for sure" as of

---

[9] When a claimant proceeds *pro se* through the administrative process, the ALJ has "a heightened duty to scrupulously and conscientiously explore all relevant facts." *Castillo v. Barnhart*, 325 F.3d 550, 552-53 (5th Cir. 2003). Because Plaintiff was represented by counsel at all relevant times, the heightened duty does not apply.

September 2008 (Tr. at 547). He noted that he had not received Plaintiff's school records and that Vineland testing would help to assess her adaptive functioning. (Tr. at 549-50.) He ultimately conceded that he had insufficient information to state a reasonable opinion concerning disability because he had no information about Plaintiff's adaptive behavior. (Tr. at 550-51.) He charact-erized Plaintiff's case as "right on the border between meeting a listing or not meeting a listing" and "it could go either way." (*Id.*) Immediately following this testimony, the ALJ recognized that he "probably should have" sent Plaintiff for a consultative examination, including Vineland testing. (Tr. at 552.) The ALJ was also concerned about not having testimony from a ME who had examined the school records. (Tr. at 553.)

Based on the reasonable suspicion of mental retardation created by the 2008 evaluation, a consultative evaluation and Vineland testing that would have either reinforced or contradicted the 2008 evaluation was necessary to fully and fairly develop the record. *See Mack v. Comm'r Soc. Sec. Admin.*, NO. 7:07-CV-021-BH, 2008 WL 3287100, at *9 (N.D. Tex. Aug. 4, 2008). Given the ME's testimony and his lack of information regarding Plaintiff's adaptive functioning, another consultative evaluation was necessary to enable the ALJ to make the disability determination. *Brock*, 84 F.3d at 728. The failure to order another psychological evaluation that included Vineland testing breach-ed the duty to fully and fairly develop the facts relevant to Plaintiff's claim for benefits. Because another evaluation might show that Plaintiff met Listing 112.05(D), she has demonstrated prejudice, and the ALJ's decision is not supported by substantial evidence. *See id.* at 728-29 (holding that to show prejudice the plaintiff must show that he or she "could have adduced evidence that might have altered the result").

18

**E.  Issue Three:  Listed Impairment**

Plaintiff argues that the ALJ improperly determined that her mental impairments did not meet or functionally meet the requirements of a listed impairment, and that she meets and functionally equals Listings 112.05(D) and (E).  (*See* Pl. Br. at 18-22.)  She also contends that the ALJ failed to consider whether her impairment medically equals the listings.  (*See id.* at 22.)

If a child claimant is not working, has a severe impairment, and meets the duration requirement, a determination must be made of whether the claimant "meets, medically equals, or functionally equals" a listed impairment in the regulations.  20 C.F.R. § 416.924(a), (d).  The claimant has the burden to show that his or her impairment or combination of impairments satisfies the listings.  *Cf. Cline v. Astrue*, 577 F. Supp. 2d 835, 846 (N.D. Tex. 2008) (accepting recommendation of Mag. J. that addresses adult disability).  *See also Perez v. Astrue*, No. Civ. A. 2:09-1504, 2009 WL 4796738, at *2 (D.N.J.  Dec. 9, 2009) (addressing childhood disability); *R.J. v. Astrue*, No. Civ. A. 1:08-1416, 2009 WL 2413924, at *4 (S.D. Ind. July 24, 2009) (same).

To meet a listed impairment, the claimant's medical findings, i.e., symptoms, signs, and laboratory findings, must match those described in the listing for that impairment.  20 C.F.R. §§ 416.925(d), 416.928.  To medically equal a listing, the claimant's medical findings must be "at least equal in severity and duration to the listed findings."  *Id.* § 416.926(a).  Determinations of equivalence must be based on medical evidence only and must be supported by medically acceptable clinical and laboratory diagnostic techniques.  *Id.* § 416.926(b).  When a claimant's impairment or combination of impairments does not meet or medically equal a listing, the Commissioner determines whether the impairment or combination of impairments "results in limitations that functionally equal the listings."  *Id.* § 416.926a(a).  This entails evaluating the impairment(s) in six domains in accord-

ance with § 416.926a(b).

### 1.  Meeting a Listing and Functional Equivalence

Plaintiff argues that she has an impairment that meets and functionally equals 20 C.F.R. Pt. 404, Appendix 1, Subpt. P § 112.05(D) and (E).  (Pl. Br. at 18-22.)  Listing 112.05 states:

> 112.05   Mental Retardation:   Characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, D, E, or F are satisfied.
>
> . . .
>
> D.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function;
>
> Or
>
> E.  A valid verbal, performance, or full scale IQ of 60 through 70 and:
>
> . . .
>
> > 2. For children (age 3 to attainment of age 18), resulting in at least one of paragraphs B2b or B2c or B2d of 112.02 . . ..

The relevant provisions of Listing 112.02(B)(2) state:

> b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or
>
> c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or
>
> d. Marked difficulties in maintaining concentration, persistence, or pace.

Additionally, Listing 112.00(D)(9) (Mental Disorders) provides that when a test derives more than one IQ, "e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series," the lowest score is used for purposes of Listing 112.05.

Plaintiff claims that her scores on the Wechsler series of testing support a finding that she had an IQ score between 60 and 70, and that nothing in the record suggests that any test score is invalid. (Pl. Br. at 19.) In January 2004, her lowest IQ score on the WISC-III was 71. (*See* Tr. at 180.) In July 2006, she had a Full Scale IQ of 71 on the WISC-IV.[10] (*See* Tr. at 266.) In September 2008, her Full Scale IQ dropped to 60 on the WISC-IV. (*See* Tr. at 454.) The ME testified that IQ testing could vary by five points, so the score could actually be as low as 66. (Tr. at 548-49.) If she has a valid IQ score between 60 and 70, Listings 112.05(D) and (E) are partially met. Plaintiff argues that she meets and functionally equals these listings because she has a valid IQ score of 60 and because she is markedly limited in two domains – (1) acquiring and using information and (2) attending and completing tasks. (Pl. Br. at 19-22.) She claims results of standardized testing by Drs. Herren and Compton reflect a marked limitation in attending and completing tasks. (*Id.* at 20.)

The ALJ agreed that Plaintiff was markedly limited in the first of these two domains but found the limitations in the second domain less than marked based on school records from August 2005 and February 2006. (Tr. at 19-20.) He noted that Plaintiff does much better when taking her medication, and that in August 2005, she "was doing well and working on grade level." (*Id.* at 20.)

Under the Commissioner's regulations, a "marked" limitation "is the equivalent of the funct-ioning [the Commissioner] would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." 20 C.F.R. § 416.926a(e)(2)(i). For

---

[10] The WISC-IV does not assess Verbal or Performance IQ. (*See* Tr. at 266, 454.)

children of any age, the Commissioner will find a marked limitation when the claimant has "a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and [the claimant's] day-to-day functioning in domain-related activities is consistent with that score." *Id.* § 416.926a(e)(2)(iii).  A test score alone is insufficient to establish a marked limitation. *Id.* § 416.926a(e)(4)(i).  The Commissioner considers test scores combined with all other information about the claimant's functioning. *Id.* § 416.926a(e)(4)(ii).

Plaintiff contends that her following scores are more than two standard deviations from the mean:  (1)  2004 score of 64 on the Freedom from Distractibility scale; (2) 2004 scale scores of 4 on Digit Span, Picture Arrangement, and Object Assembly; 3 on Arithmetic; and 2 on Similarities; (3) 2006 scaled scores of 4 on Digit Span and 3 on Picture Concepts and Matrix Reasoning; and (4) 2008 scaled scores of 4 on Vocabulary, Picture Concepts, Letter Number Sequencing, and Symbol Search and 3 on Comprehension and Digit Span.[11]  (Pl. Br. at 20.)  While recognizing that some scores may pertain to the domain of acquiring and using information, she argues that the 2008 scaled score of 4 on Symbol Search (listed under the Processing Speed category), and the 2004 scores of 4 on the Performance Tests of Picture Arrangement and Object Assembly must pertain to the domain of attending and completing tasks.  (*Id.* at 20-21.)

Plaintiff provides no authority for finding that the subtests of WISC-IV were designed to measure ability or functioning in any particular domain.  A standardized score alone is insufficient to show a marked limitation, and day-to-day functioning in domain-related activities must be consistent with the low score.  Even if the WISC-IV subtests were designed to measure ability or

---

[11] Plaintiff uses a normative mean of ten and a standard deviation of three for the scaled scores resulting from the WISC-IV in 2006 and 2008.  (*See* Pl. Br. at 20.)

function to attend and complete tasks, Plaintiff has not addressed her day-to-day functioning and has therefore not carried the heavy burden to show that she is disabled beyond doubt. Because remand is appropriate due to the prejudicial failure to adequately develop the record, and additional information may change the Step 3 determination, the Court does not decide whether substantial evidence supports the current Step 3 determination that Plaintiff had no impairment or combination of impairments that met or functionally equaled a listing.

### 2. Medical Equivalence

Plaintiff briefly argues that the ALJ failed to consider whether her impairment or combination of impairments medically equals a listed impairment. (*See* Pl. Br. at 22.) A failure to consider whether impairments medically equal a listed impairment is reversible error. *West v. Astrue*, No. 09-3024, 2009 WL 4348976, at *10-11 (C.D. Ill. Nov. 24, 2009). In this case, the ALJ specifically stated that he found no impairment medically equal to a listing. (Tr. at 17.) He does not, however, specifically address medical equivalence other than in general, conclusory terms. (*See* Tr. at 14-24.) He also did not ask the ME about medical equivalence (*see* Tr. at 542-52), or otherwise receive expert opinion on the issue as required by SSR 96-6p.

Assuming for purposes of this motion that the ALJ erred in his consideration of medical equivalence, remand for further proceedings would be required at most because Plaintiff has neither argued nor shown that she has an impairment which medically equals a listed impairment. She has not carried the heavy burden to show she is disabled under the medical equivalence prong of Step 3 and entitled to an immediate award of benefits. Because a remand will result in additional medical information and a new decision by the ALJ, the Court does not decide whether the ALJ failed to properly consider medical equivalence.

23

## III.  RECOMMENDATION

*Plaintiff's Motion for Summary Judgment* (doc. 16) should be **GRANTED** to the extent she seeks remand for further proceedings, the *Commissioner's Motion for Summary Judgment* (doc. 17) should be **DENIED**, and the decision of the Commissioner should be **REVERSED** and the case **REMANDED** for further proceedings.

**SO RECOMMENDED**, **on this 30th day of April, 2010.**

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE